**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**PHILIP BRET CABANISS,**

**Plaintiff,**

**v.**

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security,**

**Defendant.**

**No. 13 CV 4244**

**Magistrate Judge Mary M. Rowland**

## MEMORANDUM OPINION AND ORDER

Plaintiff Philip Bret Cabaniss filed this action seeking review of the final

decision of the Commissioner of Social Security (Commissioner) denying his

applications for Disability Insurance Benefits under Title II of the Social Security

Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the

jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c),

and have filed cross motions for summary judgment. For the reasons stated below,

the case is remanded.

## I. PROCEDURAL HISTORY

Cabaniss applied for Social Security Disability benefits on October 22, 2010,

alleging that he became disabled on February 1, 2010, due to bipolar disorder,

major depressive disorder, severe back problems, heart problems, and high blood

pressure. (R. at 97–101). The application was denied initially on February 23, 2011

(*id.*), and on reconsideration on April 13, 2011 (*id.* at 103–06), after which Cabaniss filed a timely request for a hearing (*id.* at 107–08). On January 5, 2012, Cabaniss, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 52–94). Richard J. Hamersma, Ph.D., an impartial vocational expert (VE), also testified at the hearing. (*Id.* at 88–94).

The ALJ denied Cabaniss's request for benefits on February 16, 2012. (R. at 27–51). Applying the five-step sequential process, the ALJ found at step one that Cabaniss has not engaged in any substantial gainful activity since February 1, 2010, the alleged onset date. (*Id.*) At step two, the ALJ found that Cabaniss has the following severe impairments: "degenerative disc disease of the lumbar spine and degenerative facet arthropathy; affective disorder; obesity; and history of substance abuse, in reported remission." (*Id.*). At step three, the ALJ found that Cabaniss does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments. (*Id.* at 33).

The ALJ then assessed the Plaintiff's residual functional capacity (RFC)[1] and determined that he has the RFC to perform light work, specifically that he is able to lift and carry 20 pounds occasionally and 10 pounds frequently, and that he can be on his feet standing and walking for approximately 6 hours, with normal rest periods. (R. at 35). Cabaniss, the ALJ found, "is unable to work at heights or frequently climb ladders," and "should avoid exposure to fumes, dust, odors, gases,

---

[1] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675–76 (7th Cir. 2008).

or poorly ventilated areas." (*Id.*). The ALJ also found that Plaintiff "would be unable to understand, remember, and carry out detailed and complex job tasks. He is not suited for work that requires intense focus and concentration for extended periods. He may only have casual interaction with the general public." (*Id.*). Plaintiff would be expected to be off task approximately 5% of the time in an 8-hour workday. (*Id.*)

Based on Plaintiff's RFC and the VE's testimony, the ALJ found that the Plaintiff is capable of performing past relevant work of "inspecting." (R. at 44). Accordingly, the ALJ found Cabaniss was not suffering from a disability as defined by the Act. (*Id.* at 46).

The Appeals Council denied Plaintiff's request for review on May 14, 2013. (R. at 1–6). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## II. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001).[2] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted

---

[2] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standards for determining DIB are virtually identical to those for Supplemental Security Income (SSI). *Craft*, 539 F.3d at 674 n.6. Accordingly, this Court cites to both DIB and SSI cases.

or can be expected to last for a continuous period of not less than 12 months." 20

C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability,

the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir.

2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to

a finding that the claimant is disabled. A negative answer at any point, other than

Step 3, ends the inquiry and leads to a determination that a claimant is not

disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of

proof is on the claimant through step four; only at step five does the burden shift to

the Commissioner." *Clifford*, 227 F.3d at 868.

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of

the SSA. In reviewing this decision, the Court may not engage in its own analysis of

whether the plaintiff is severely impaired as defined by the Social Security

Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it

"reweigh evidence, resolve conflicts in the record, decide questions of credibility, or,

in general, substitute [its] own judgment for that of the Commissioner." *Id.* The

Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. MEDICAL EVIDENCE

### A. Mental Health Records

Cabaniss was diagnosed with Major Depression in March 2009. (R. at 426). He reported at the time that people made fun of him at work, and that "sometimes he wants to kill them." (*Id.*). Two weeks later, Cabaniss had thoughts of jumping on

the train tracks and of harming his co-workers, and was immediately voluntarily hospitalized at Chicago Read Mental Health Center for more than a month. (*Id.* at 427, 469). The Department of Human Services' Discharge Summary diagnosed Mood Disorder, NOS, Personality Disorder, NOS, Substance Abuse by History, Hypertension, Gastroesophageal Reflux Disease, Inactive, Bilateral Hearing Loss, and Latent Tuberculosis. (*Id.* at 282). The initial assessment notes indicated a previous psychiatric admission at Madden Mental Health Center due to a suicide attempt, as well as two private and two other state hospitalizations. (*Id.* at 299).

Cabaniss was diagnosed with a Bipolar I Disorder by Dr. Subhash Goyal, a psychiatrist, who changed Cabaniss's Depakote prescription to lithium, twice a day. (R. at 476–78, 482). Over the 20 months between May 2009 and December 2010, Cabaniss met with Dr. Goyal, Dr. Raasheen Roberts and Dr. Elizabeth Canelas regularly (*e.g.*, *id.* at 481–541), and received medications for his mood disorder, which was characterized as Bipolar I Disorder (*e.g.*, *id.* at 540) or Unspecified Episodic Mood Disorder and Unspecified Personality Disorder (*id.* at 545).

Beginning in May 2009, Cabaniss also met regularly with Ruth Mills, LCSW. (*E.g.*, R. at 371–74, 479–80, 642). In a Comprehensive Health Assessment conducted on May 21, 2009, Mills noted that Cabaniss had seven previous suicide attempts, all by overdose, and one by shooting himself. (*Id.* at 346). Mills's progress notes report that Cabaniss was hospitalized for 30 days in April and May 2009 with suicidal and homicidal ideation against his boss after his hours were cut. (*Id.* at 345–51). Mills also wrote that Cabaniss was sexually abused by his brother and a neighbor at ages

nine and ten. (*Id.* at 348). Mills estimated Cabaniss's Global Assessment of

Functioning (GAF) at 45,[3] and diagnosed Cabaniss with Bipolar I Disorder, current

or most recent episode mixed, unspecified severity.[4] (*Id.* at 345–51)

Dr. Raasheen Roberts conducted a Psychiatric Evaluation on July 23, 2009,

made the same diagnosis as Dr. Goyal, but changed the dosages of Cabaniss's

medications. (R. at 483–89). These diagnoses and anti-depressant prescriptions

continued throughout Cabaniss's treatment, with Major Depression Disorder

Diagnosis noted in some progress notes. *(See, e.g.*, *id.* at 522–30, 534–41). Mills also

noted that Cabaniss's "physical pain has exacerbated his depression." (*Id.* at 524).

On December 10 and 16, 2009, Dr. Elizabeth Canelas noted Cabaniss's Bipolar

Disorder, most recent episode unspecified, and Major Depression, Recurrent,

Unspecified Severity. (*Id.* at 505, 509). LCSW Mills concurred in this diagnosis on

February 3 and March 3, 2010. (*Id.* at 510, 522).

Mills provided a Mental RFC Assessment of Cabaniss on December 8, 2010. (R.

at 267–70). She noted that Cabaniss suffered from delusions or hallucinations,

---

[3] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* [hereinafter DSM IV] 32 (4th ed. Text Rev. 2000). A GAF of 41–50 indicates "Serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). *Id.* 34. The Court notes that the fifth edition of the DSM, published in 2013, has abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013); *see Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (recognizing that the American Psychiatric Association abandoned the GAF scale after 2012).

[4] This diagnosis is made when the patient demonstrates the criteria for "at least 1 week . . . for a Manic Episode and for a Major Depressive Episode nearly every day." DSM IV at 362.

anhedonia or pervasive loss of interests, and paranoia or inappropriate suspiciousness, and she assigned him a GAF of 40.[5] (*Id*. at 267). She also determined that he had moderate restrictions in his activities of daily living, moderate difficulties in maintaining social functioning, and often suffered from deficiencies of concentration, persistence or pace. (*Id*. at 270). Finally, she noted that Cabaniss "has some residual [symptoms] from previous drug abuse." (*Id.)*

On July 23, 2011, Mills met with Cabaniss, and noted his then-current medications: Depakote, Paxil, Quetiapine and Seroquel for his mental health issues, and Tramadol for pain. (R. at 807–09). Dr. Goyal determined on September 13, 2011, that Depakote was not helping Cabaniss. (*Id*. at 804). He wrote that Cabaniss had not gone for baseline blood work to assess whether he was at therapeutic levels of Depakote. (*Id*.). This latter notation comports with Cabaniss's testimony at the hearing that he could not afford the blood test his psychiatrist required of him in order to continue to prescribe Depakote. (*Id*. at 73). Cabaniss also testified that instead of prescribing his former medications (Depakote, Seroquel and Paxil), Dr. Goyal gave him other anti-depressant medications. (*Id*.)

On October 31, 2011, Cabaniss was taken to the emergency room after calling 911 and reporting that he had taken a bottle of sleeping pills. (R. at 838). Progress Notes from his emergency room visit reflect Cabaniss's statements that he took the pills thinking, "it would be good to not wake up, but it did not work." (*Id*. at 818).

---

[5] A GAF of 31–40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work)." DSM IV at 34.

The emergency room intake staff wrote that Cabaniss stated that he had lost his unemployment benefits a week prior. (*Id.* at 838). At the hearing before the ALJ, Cabaniss testified that he took the two bottles of sleeping pills because he was severely depressed, and in order to get sleep. (*Id.* at 75, 85). The emergency room progress notes reflect that it was a suicide attempt and that Cabaniss had "persistent suicidal ideation." (*Id.* at 817). Cabaniss reported to the emergency room staff that his medication was not helping him. (*Id.* at 838). Dr. Nazmuddin at Madden Mental Health Center conducted a Comprehensive Psychiatric Evaluation, and described Cabaniss's symptoms as depression, suicidal ideation, and paranoid delusions. (*Id.* at 840, 843). He diagnosed Cabaniss with Major Depression, Recurrent, Severe, with Psychosis (noted as paranoia), and assigned a GAF of 41. (*Id.* at 843). Dr. Nazmuddin ordered frequent observations of Cabaniss, inpatient treatment, and medication management. (*Id.*). He noted a high potential for suicide, and overall his prognosis was guarded. (*Id.*).

## B. Physical Health Records

Cabaniss's main physical health issue is degenerative back disease. At a pain clinic appointment at Stroger Hospital on April 5, 2010, Cabaniss reported that he experienced 10/10 pain in his lower back, and had missed many days of work in the previous three months because of the pain. (R. at 390). Cabaniss stated that walking two blocks lead to pain for two days, and that taking Tramadol and Aleve did not provide him relief from the pain. (*Id.* at 391). On April 13, 2010, Cabaniss reported to LCSW Mills that he had a lot of back pain, and that his medication

"makes him unable to function during the day." (*Id*. at 524). Cabaniss also continued to see physicians at the Stroger Pain Clinic for his low back pain in April 2010, and reported that his back pain radiated occasionally to his toes in his left foot, and felt "sharp" and "electric." (*Id*. at 387). Cabaniss was diagnosed with osteoarthritis and chronic low back pain. (*Id*. at 388).

In September 2010, he continued to have back pain, and felt the pain "as achy pain in the lower back, mostly on the left, and it gets worse when he plays basketball. . . . Says pain radiates down left leg, but only feels like tightness, not burning or tingling." (R. at 383). His exam was "negative for any findings except for reproducible pain on spasm of left paraspinous muscles just superior to PSIS with palpation." (*Id*.) A lumbar x-ray showed "mild to moderate degenerative changes at discs and facet joints in mid and lower lumbar spine," and "[b]ilateral L5/S1 neural foramina narrowing." (*Id*. at 334–35). The Stroger Pain Clinic administered injection treatment in November 2010. (*Id*. at 382–83).

Cabaniss is obese, and suffers from leg edema. In May through July 2010, Cabaniss weighed 335 pounds, and he was seen at a clinic for bilateral leg edema. (R. at 418–20). On October 22, 2010, Cabaniss had a BMI of 39.7, with his weight at 333 pounds.[6] (*Id*. at 454). Cabaniss wrote in his November 30, 2010 Function Report that he could walk 2½ blocks without stopping to rest. (*Id*. at 203). He described needing to use his arms to get up from bed or from a chair, and he stated there was

---

[6] A BMI of 30–34.9 indicates obesity. A BMI of 35–49.9 indicates severe obesity. www.clevelandclinic.meded.com/medicalpubs/diseasemanagement/endocrinology/obesity (last visited on September 17, 2014).

stiffness in his lower back that lead to a "good amount of pain" if he sat for two hours or more. (*Id*. at 208). If he walked to do heavy loads of laundry or clean his room for two to three hours, Cabaniss reported needing to rest for one to two hours. (*Id*.).

Cabaniss reported lower back pain in December 2010 and described having relief after an injection two weeks earlier. (R. at 451). He was scheduled for another injection in early January 2011. (*Id*.) He appears to have received relief for two weeks after the January injection, but he returned to the pain clinic complaining of sharp pain radiating to his left leg, with numbness and tingling. (*Id*. at 794). On February 24, 2011, Cabaniss received a lumbar MRI and was found to have "[m]ultilevel degenerative disc disease and degenerative facet arthropathy." (*Id*. at 679–80).

Cabaniss filled out a second Function Report in April 2, 2011, in which he stated that he takes so many medications that he is not certain which cause side effects, but he is "dizzy and off-balance" every day. (R. at 233). He reported a "good deal of pain" if he sits longer than 20 minutes. (*Id*. at 236). He also stated that his back and knees keep him from walking more than three blocks without stopping "for a while." (*Id*. at 226).

By June 2011, Cabaniss's weight had climbed to 354 pounds. (R. at 822). Cabaniss was admitted to Stroger Hospital on August 17, 2011, complaining of swelling in his ankles and feet, and sharp pain in his lower back, with numbness and tingling down his legs. (*Id*. at 790–94).

### C. Assessments Performed for Social Security Administration

#### 1. Psychiatric Evaluation Report

Henry Fine, M.D., provided a psychiatric evaluation for the DDS on January 27, 2011. (R. at 643–46). He spent 45 minutes with Cabaniss. He wrote that Cabaniss had been hospitalized three times for depression with homicidal and suicidal ideation, first for nine months in 1993 or 1995, when he was diagnosed, then for one and a half months three years later, and last for one month around 2009. (*Id*. at 643). He also noted Cabaniss's statement that he had attempted suicide several times, including by once shooting himself, and that Cabaniss had auditory hallucinations twice, although they coincided with substance abuse and may be due to those substances only. (*Id*.). Dr. Fine also recorded Cabaniss's previous sexual abuse, and his recurrent nightmares and intrusive thoughts relating to the abuse. (*Id*.).

Dr. Fine wrote that Cabaniss "gets angry and easily frustrated, which is when he gets the homicidal ideation." (R. at 643). After testing Cabaniss's memory, reasoning and other mental capacities, Dr. Fine concluded that Cabaniss should be properly diagnosed with post-traumatic stress disorder (PTSD) rather than bipolar disorder, clarifying that PTSD had only more recently become understood. (*Id*. at 645–46).

#### 2. Mental RFC Assessment

Glen Pittman, M.D., provided a Mental RFC Assessment for Cabaniss on February 11, 2011. (R. at 647–64). He concluded that Cabaniss was able to do

simple, unskilled work. (*Id*. at 649). Dr. Pittman opined that Cabaniss was moderately limited in his ability to "understand and to remember detailed instructions," and "to carry out detailed instructions," and for his ability to "maintain attention and concentration for extended periods." (*Id*. at 647). Dr. Pittman also found Cabaniss moderately limited in his ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods." (*Id*. at 648). Finally, Dr. Pittman found Cabaniss "moderately limited" in his ability "to interact appropriately with the general public" and "to set realistic goals or make plans independently of others." (*Id*.). Dr. Pittman concluded that Cabaniss's medications were controlling his mood well, and that the medical records showed "no thought disorder, some mild affective complaints, no cognitive deficits. Adaptive functions are satisfactory w/adequate social abilities." (*Id*. at 649).

### 3. *Psychiatric Evaluation/Physical Exam*

Dr. Alexander Panagos provided an internal medicine consultative examination of Cabaniss for the DDS on January 18, 2011. (R. at 637–40). He stated that Cabaniss could walk ten feet or climb five stairs without an assistive device, and that Cabaniss's gait was normal. (*Id*. at 637). He noted Cabaniss's height and weight, but not his body mass index. Dr. Panagos confirmed Cabaniss's diagnoses of bipolar disorder and depressive disorder, chronic back pain, hypertension and "questionable heart disease," noting that Cabaniss said he thought he had heart

problems, but that a stress test was negative, and there were no other heart tests. Dr. Panagos spent 30 minutes with Cabaniss, and reviewed some limited medical records.

### 4. *Physical RFC Assessment*

Dr. Frank Jimenez, a medical consultant, completed a Physical Residual Functional Capacity Assessment for Cabaniss. (R. at 665–72). He found that Cabaniss could occasionally lift and/or carry 50 pounds or more, frequently lift and/or carry 25 pounds, and could sit or stand and/or walk for 6 hours in an 8-hour workday. (*Id*. at 666). Cabaniss could occasionally climb ramps or stairs, or ladders, ropes or scaffolds, but in limited amounts due to obesity. (*Id*. at 667). Dr. Jimenez found that Cabaniss could not heel and toe walk, and could not run. (*Id*. at 672).

## V. DISCUSSION

The Plaintiff moves for summary judgment asserting that: (1) the ALJ's credibility determination was improper; (2) the ALJ's step four analysis incorrectly evaluated Cabaniss's former job position; and (3) the ALJ's step five analysis was flawed because the ALJ did not evaluate Cabaniss's RFC properly. (Mot. 1–2). The Court will address the first two of these arguments, beginning with the ALJ's credibility evaluation.

## A. The ALJ's Credibility Determination Is Patently Wrong

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft*, 539 F.3d at 678. In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or

symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); Social Security Ruling (SSR)[7] 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

---

[7] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

Plaintiff testified that because of his back and knee pain, he can walk only four blocks before needing to stop and rest. (R. at 76, 84, 86). He can stand for 30 minutes at a time and sit about two to three hours. (*Id.* at 76, 78). He can carry about seven pounds but not repeatedly. (*Id.* at 77, 83–84). Plaintiff has trouble getting along with others, partly because of his hearing and speech difficulties. (R. at 79). His depression causes him to be irritable and upset with others. (*Id.*). He is frequently exhausted because he has trouble getting enough sleep, even with sleeping pills. (*Id.* at 85).

In his decision, the ALJ found Plaintiff's testimony about the intensity, persistence and disabling impact of his depression and back pain not credible to the extent that they were inconsistent with the RFC:

> [Plaintiff] was able to testify clearly and consciously at the hearing, with no apparent difficulty. [Plaintiff] has demonstrated frequent non-compliance with his treatment regimen, as detailed above.
>
> In terms of [Plaintiff's] alleged depression, he acknowledged that he stopped taking anti-depressant medication because it was diminishing his sex drive, suggesting that his symptoms of depression were not as severe as he alleged at hearing. Further reducing [Plaintiff's]

allegations of disabling symptoms of depression are his treatment records/notations. On July 29, 2011, it was noted that [Plaintiff] "had no emotional/cognitive behavioral symptomology that impairs his ability to function adequately within the community." He was also deemed able to function in this environment "without the support of the Mental Health Center staff." He exhibited "minimal risk for relapse or aggravation of symptoms that precipitated treatment" and he was thus discharged from care. . . .

In relation to [Plaintiff's] allegations of disabling back pain, he has provided inconsistent statements regarding his care, pain level, and activity abilities. I note that while [Plaintiff] alleges that he became disabled on February 1, 2010, on September 30, 2010, [Plaintiff] sought treatment reporting that he experiences achy pain in his back when he plays basketball, an activity not consistent with disabling pain or limitations. [Plaintiff] reportedly cleaned at his residential facility as in kind payment for his rent. He provided inconsistent statements regarding the cause of termination of his past work; the cessation of his unemployment benefits; and his continued alcohol use.

(R. at 42–43) (citations omitted).

Under the circumstances, the reasons provided by the ALJ for rejecting Plaintiff's credibility are not legally sufficient or supported by substantial evidence. First, as a preliminary matter, the ALJ failed to assess Plaintiff's credibility *before* determining his RFC. That Plaintiff's statements were "not credible to the extent they are inconsistent with the above residual functional capacity assessment" (R. at 42) is "backward reasoning," *Dogan v. Astrue*, 751 F. Supp. 2d 1029, 1042 (N.D. Ind. 2010); *Johnson*, 2014 WL 2765701, at *3 ("Most significantly, the template gets things backwards."). "The implication is that the assessment (of the claimant's residual functional capacity—that is, ability to work) precedes and may invalidate the claimant's testimony about his or her ability to work." *Goins*, 2014 WL 4073108, at *4; *see Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 788 (7th Cir. 2003) (The ALJ's "post-hoc statement turns the credibility determination process on its

head by finding statements that support the ruling credible and rejecting those statements that do not, rather than evaluating the [claimant's] credibility as an initial matter in order to come to a decision on the merits."). On the contrary, Plaintiff's testimony must be factored into the ALJ's determination of Plaintiff's ability to work. *Goins*, 2014 WL 4073108, at *4.

Second, the ALJ's attempt to discredit Plaintiff's claims of depression demonstrates a fundamental misunderstanding of mental illness. The ALJ noted that Plaintiff testified "clearly and consciously at the hearing, with no apparent difficulty." (R. at 42). By cherry-picking a single moment in time, "the ALJ demonstrated a fundamental, but regrettably all too-common, misunderstanding of mental illness. As [the Seventh Circuit Court of Appeals has] explained before, a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [his] overall condition." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011) (citations omitted); *see Kangail v. Barnhart*, 454 F.3d 627, 629–30 (7th Cir. 2006) (mental illnesses are often episodic). Further, Cabaniss's "frequent non-compliance with his treatment regimen" (R. at 42) does not undermine his credibility. On the contrary, a common consequence of mental disorders is the patient's inability to take prescribed medications and follow suggested treatment regimens. *See Martinez v. Astrue*, 630 F.3d 693, 697 (7th Cir. 2011) (mental patients "are often incapable of taking their prescribed medications consistently."); *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010) ("The administrative law judge's reference to Spiva's failing to take his medications

ignores one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medications."). Indeed, a common consequence of bipolar disorder is for the patient to take his medications during his depressive episodes but not during his manic periods. *Martinez*, 630 F.3d at 697. Moreover, "antidepressant drugs often produce serious side effects that make patients reluctant to take them." *Id.*

Third, the ALJ concluded that Plaintiff's "allegations of disabling symptoms of depression are [discredited by] his treatment records." (R. at 42). The ALJ cited to a *single record* that suggested Plaintiff was capable of functioning in the community. (*Id.*; *see id.* at 802). But Plaintiff does not suffer merely from depression; he has a mood disorder (bipolar disorder), which involves widely fluctuating symptoms. DSM–IV at 401, 404 (A mood disorder "may involve depressed mood; markedly diminished interest or pleasure; or elevated, expansive, or irritable mood."); *see Bauer*, 532 F.3d at 609 ("A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job."); *Phillips v. Astrue*, 413 F. App'x 878, 886 (7th Cir. 2010) ("The ALJ's assessment of the medical record also demonstrates a misunderstanding about the nature of mental illness. . . . Many mental illnesses are characterized by 'good days and bad days,' rapid fluctuations in mood, or recurrent cycles of waxing and waning symptoms."); *Larson*, 615 F.3d at

751 ("More importantly, symptoms that 'wax and wane' are not inconsistent with a diagnosis of recurrent, major depression."); see also *Spiva v. Astrue*, 628 F.3d 346, 348 (7th Cir. 2010) (collecting cases). Even assuming that Plaintiff's "improved" symptoms were more than an isolated instance, it does not mean that he was capable of maintaining a full-time work schedule. *See Scott v. Astrue*, 647 F.3d 734, 739–40 (7th Cir. 2011) ("There can be a great distance between a patient who responds to treatment and one who is able to enter the workforce . . . .").

The ALJ cannot discuss only those portions of the record that support his opinion. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). In making a credibility assessment, the ALJ must consider the objective medical evidence, including "statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (quoting SSR 96-7p, additional citation omitted); *see* C.F.R. § 404.1529(c). Here, Cabaniss's psychiatrists—and there were several whose treatment notes appear in the record—provide repeated examples of their respective findings that he suffered from severe depression, bipolar disorder, and suicidal ideation. (*See*, *e.g.*, R. at 364, 482–89, 505, 509, 534–41, 838, 843). The ALJ does not address these records and instead focuses on language contained in a single document. That is precisely what the regulations do not allow.

Fourth, Plaintiff fully and adequately explained why he changed his antidepressant medication. The ALJ found that because Cabaniss "acknowledged

that he stopped taking anti-depressant medication because it was diminishing his sex drive, . . . his symptoms of depression were not as severe as he alleged at hearing." (R. at 42) (citing *id.* at 804). But Cabaniss testified that after reporting Paxil's adverse side effects, his psychiatrist replaced Paxil with a different antidepressant. The Seventh Circuit has indicated that a claimant's refusal to take medication due to unwanted side effects may be excused. *See Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013); *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009); SSR 96-7p, at *8 ("The individual may not take prescription medication because the side effects are less tolerable than the symptoms"). Here, Cabaniss stated a reason for discontinuing his Paxil, he discussed it with his doctor, and his doctor adjusted his medication. There is nothing to indicate that Cabaniss did not need anti-depressants, he simply wanted to try medication without the unwanted side effects. It is not clear to the Court why the ALJ found that this decision, made between patient and doctor, did anything to diminish Plaintiff's credibility.

Finally, the ALJ's conclusion that many of Cabaniss's statements were inconsistent is not supported by substantial evidence. (R. at 42) (finding Cabaniss not credible in part because "he has provided inconsistent statements regarding his care, pain level and activity abilities"). The ALJ discredited Cabaniss because he admitted cleaning at the single room occupancy (SRO) where he resided, in lieu of paying rent. (R. at 42–43; *see id.* at 763 (Cabaniss noting that he "lives in a SRO, has not paid rent there but helps with the cleaning of common areas, etc."). But the description of Cabaniss's "help with the cleaning" is vague, and could reasonably be

characterized as household cleaning. The ALJ points to nothing, and the Court has found nothing in the record to indicate, that Cabaniss was held to any particular schedule or standard. "[A]lthough it is appropriate for an ALJ to consider a claimant's daily activities when evaluating [his] credibility, SSR 96-7p, at *3, this must be done with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Indeed, the Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Id*. The Court further instructs that household chores cannot be equated with employment because they can be done on a flexible schedule and with help from others, and are not held to a performance standard. *Hughes v. Astrue*, 705 F.3d 276, 278 (7th Cir. 2013) (stating that "[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer") (quoting *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012)). This is not a proper basis for finding Cabaniss not credible.

The ALJ's conclusion that Cabaniss "provided inconsistent statements regarding the cause of termination of his past work" (R. at 43) is also not supported by substantial evidence. On January 27, 2011, Cabaniss reported to Dr. Fine that in February 2009, he was fired from his janitorial job after he was released from Read Mental Center because "they tried to say it was because he was coming in late." (*Id*.

at 644). At the hearing a year later, Cabaniss testified that: "they were making me work harder than everybody else in the plant" (*id*. at 60), but also that, "I wasn't meeting their expectations no more because my back became such a problem where I was taking days off. I was only working like three days a week" (*id*. at 63). He testified that he was able to do the work, and that he had a problem with the new vice president (*id*. at 64), and that he wanted to quit (*id*. at 66). When pressed on that point, Cabaniss responded that "I thought I was a good employee, but I was in so much pain doing the work that I felt personally that I wasn't considered about [*sic*] good employee. My thinking was that how long can I do this job in the physical pain that I was in."[8] (*Id*. at 66). These statements are not contradictory. It's clear that Cabaniss is not certain why he was fired and offered several plausible explanations related to his inability to work fulltime due to his back pain.

Likewise, the ALJ's conclusion that Cabaniss's unemployment statements are inconsistent is not supported by the record. On October 13, 2011, Cabaniss reported being depressed after his unemployment benefits were denied. (R. at 815). At the hearing, Cabaniss testified that he stopped applying for unemployment benefits when he realized that his physical difficulties made it impossible to find any work. (*Id*. at 64–65). The ALJ offers no explanation for how these two statements are contradictory. *See Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004) (The Court

---

[8] The ALJ's response to this comment is troubling. He responded, "[b]ut that's irrelevant if they don't see you sweat." (R. at 66). He added, "Nobody ever told me I'm incompetent or that I don't deserve being a judge because I'm deficient in my performance, but I have done work under very difficult circumstances. You don't see me sweat. See what I mean?" (*Id*.).

must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion").

The ALJ stated, without citation or any explanation, that one of the bases for finding Cabaniss not credible was his "inconsistent statements" regarding "his continued alcohol use." (R. at 43). Here, the ALJ has left the Court without a basis for any assessment. Cabaniss has not denied that he continues to drink alcohol on occasion; instead, he has consistently asserted that he no longer abuses drugs and alcohol as he did many years previously. (*See*, *e.g.*, *id.* at 282, 346, 350, 375, 643, 644). Indeed, the ALJ found that Cabaniss "has been in extended remission from drug abuse and alcohol abuse (albeit not use), during the period of consideration." (*Id.* at 34). The ALJ noted that in March 2010, Ruth Mills, LCSW, LPHA, observed that Cabaniss smelled of alcohol despite his claiming to have stopped drinking two weeks prior. (*Id.* at 39; *see id.* at 737). But Mills accepted Cabaniss's explanation that "he sprayed his clothes with fabric spray to get the cigarette smoke out of them." (*Id.*). And the ALJ did not question Cabaniss about any "inconsistencies" at the hearing.

The ALJ also concluded that playing basketball was inconsistent with Cabaniss's claims of disabling back pain. (R. at 42). On September 30, 2010, Cabaniss reported pain in his lower back that is aggravated when he plays basketball. (*Id.* at 383). This isolated reference to basketball does not undermine Cabaniss's credibility. Given Cabaniss's severe obesity, it is unlikely that he was *playing* basketball as opposed to shooting baskets in light of the objective medical

evidence from January 2011, when Dr. Panagos examined Cabaniss on behalf of the Commissioner, and found that he could neither run nor heel and toe walk. (*Id.* at 637, 640; *accord id.* at 672).

The Court finds the ALJ's credibility determination "patently wrong." *Craft*, 539 at 678. On remand, the ALJ shall reevaluate Plaintiff's complaints with due regard for the full range of medical evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

## B. The ALJ's Step Four Analysis

Plaintiff argues that the ALJ performed the step four analysis incorrectly. The ALJ found at step four that Cabaniss could perform his past relevant work as an inspector because that work did not require the performance of any work-related activities precluded by his RFC. (R. at 44). Cabaniss asserts that his previous work was a "composite job," which requires a more exacting analysis than the ALJ performed.

Cabaniss testified that his job consisted of two parts: first he would work from 6:30 a.m. to 12:00 p.m. as a janitor at the Jackson Spring Manufacturing Company factory. (R. at 58, 171). From 12:30 p.m. to 3:00 p.m., Cabaniss worked in production at the factory. He described that job at the manufacturing plant as follows: "it's a [inaudible] manufacturing plant, and they had to put springs in box [*sic*] in a machine to grind down the frames when it spins around, and we have to check them to see if they're grinded to the right side, throw them out if any got destroyed in the grinding process." (*Id.* at 58–59). He then had to fill a box with the frame, and take

them to another area in the plant, and have them weighed. (*Id.* at 59–60). The springs weighed between 20 and 60 pounds apiece. (*Id.*). The VE testified that the production job was an "inspection" job, and characterized it as "heavy and unskilled." (*Id.* at 88). Plaintiff did not challenge this characterization.

The ALJ asked the VE whether Cabaniss was capable of performing the work he did in the past, either as he described it or as it is listed in the DOT, and the VE responded that "The only job he would be able to do based on the DOT would be the inspection job, which the DOT has listed as light and unskilled." (R. at 90). There were no questions relating to the janitorial job. The ALJ's remaining questions related to other light exertional level jobs that Cabaniss could potentially perform. (*Id.* at 91–92).

Where a claimant's previous work involves a job that "has significant elements of two or more occupations, that work consists of a composite job and must be evaluated according to the particular facts of each individual case." *Trammell v. Colvin*, No. 12 CV 6780, 2014 WL 1227565, at *8 (N.D. Ill. Mar. 25, 2014) (internal quotations omitted) (quoting SSR 82-61, at *2). The *Trammell* court further stated that:

> Where the claimant's past work consists of a composite job, an ALJ may not deem a claimant capable of performing past relevant work by dividing the demands of a composite job into two separate jobs and finding . . . her capable of performing the less demanding of the two jobs. In other words, the ALJ's conclusion that a claimant is not disabled should not be based on her ability to perform only a subset of her past relevant work.

*Id.* (internal quotation and citation omitted).

There was no discussion in the hearing or in the ALJ's decision about whether Cabaniss's job was a composite job, yet the description Cabaniss testified to does indicate that there were two separate components to his job at Jackson Springs: the janitorial work, and the production/inspection job. The ALJ's decision was based upon dividing the demands of Cabaniss's past work into two separate jobs, and then finding him capable of performing the less demanding of those jobs—the "inspection" job, as the VE characterized it. As such, the Court must remand for a reevaluation of step four. "Where an ALJ simply classifies an applicant's 'past relevant work' according to the least demanding function of the claimant's past occupations, the evaluation is contrary to the letter and spirit of the Social Security Act." *Peterson v. Astrue*, No. 09 CV 209, 2010 WL 3219293, at *7 (N.D. Ind. Aug. 12, 2010). The ALJ is required to separately analyze each job within the composite job.[9]

## C. Summary

On remand, the ALJ must reconsider Cabaniss's credibility, taking into account all the record medical evidence, including that from Cabaniss's treating physicians. The ALJ must discuss the factors in 20 C.F.R. §§ 404.1527 and 404.1529, and determine the weight to be assigned to the opinions of Cabaniss's treating physicians in light of the other substantial evidence in the record. The ALJ must also take into account "the bearing of obesity, even when not itself disabling, on [the] claimant's ability to work" and "must consider the *combined* effects of the

---

[9] The Plaintiff also argues that the ALJ made errors at step five of his analysis. Because the Court is remanding for a reevaluation of the ALJ's credibility determination, the Court will not address Plaintiff's RFC arguments. However, after properly reevaluating credibility, the ALJ must evaluate anew Plaintiff's RFC.

applicant's impairments." *Browning v. Colvin*, 766 F.3d 702, 706 (7th Cir. 2014) (emphasis in original). For Cabaniss, this would entail the combined effects of his bipolar disorder, depression, severe back problems and high blood pressure, along with obesity. The ALJ must then reevaluate his RFC finding, consistent with a proper credibility determination. Finally the ALJ must reevaluate step four of his analysis, making sure to analyze each job within Cabaniss's former composite job.

## VI. CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment [10] is **GRANTED** and the Commissioner's Motion for Summary Judgment [26] is **DENIED**. Pursuant to sentence four of 42 U.S.C. §405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: December 30, 2014

_____
MARY M. ROWLAND
United States Magistrate Judge